UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| CINDY MCNATT, individually and as dependent administrator of Estate of JOSHUA RAY MCNATT, and on behalf of JOHN MCNATT, minor T.R.M., the ESTATE OF JOSHUA RAY MCNATT, and all of JOSHUA RAY MCNATT'S heirs-at-law and wrongful death beneficiaries, | § § § § § § § § | |
| Plaintiff, | § | |
| | § | CIVIL ACTION NO. 1:23-cv-00019 |
| v. | § | |
| | § | JURY DEMANDED |
| WILLIAMSON COUNTY, TEXAS; BRANDON W. MCBAY; JIMMY D. MOBLEY; and SARA E. PECORILLA, | § § § § | |
| Defendants. | § § § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

> **This is a case of the preventable death by suicide of 37-year-old Joshua McNatt. Mr. McNatt, suicidal, was left alone in a cell with tie-off points and ligatures.**



<u>Table of Contents</u>

I.    Introductory Allegations ..................................................................................4

    A.    Parties............................................................................................................4

    B.    Jurisdiction and Venue...................................................................................7

II.   Factual Allegations ..........................................................................................7

    A.    Introduction....................................................................................................8

    B.    Josh's Predictable Suicide in the County Jail ...............................................8

        1.    Josh's Prior Jail Incarcerations ..............................................................9

        2.    Josh's Incarceration Concluding in his Death .....................................11

        3.    Witness Statements ..............................................................................15

            a.    Barnett, Ronald – Medical Sergeant ...............................................16

            b.    Bradburn, Michael – Jailer................................................................16

            c.    Braune, Austin - Jailer......................................................................16

            d.    Brumleve, Michael - Lieutenant ......................................................17

            e.    Forehand, Rex – Medical Officer .....................................................17

            f.    Frank, John – Property Officer .........................................................17

            g.    McBay, Brandon - Jailer...................................................................18

            h.    Miller, David – Medical Officer .......................................................22

            i.    Mobley, Jimmy – Jail Sergeant........................................................22

            j.    Ortiz, Fernando – Jailer....................................................................24

            k.    Parks, Peter - Detective....................................................................26

            l.    Pecorilla, Sara – Medical Officer......................................................28

            m.    Price, Alexander - Deputy................................................................29

            n.    Rodriguez, Valerie – Jailer ...............................................................30

            o.    Watson, Kevin – Medical Officer .....................................................30

        4.    Death Reports.......................................................................................30

            a.    Autopsy Report ...............................................................................31

            b.    Custodial Death Report (Filed with Attorney General)...........31

            c.    Inmate Death Report (Filed with Texas Commission on Jail
                  Standards) ......................................................................................32

    C.    Investigation by Texas Commission on Jail Standards ..................................33

    D.    Defendants' Knowledge and Education..........................................................36

        1.    Jail Suicides are a Known, Widespread Problem. ...............................36

2.    Fifth Circuit's Long-Held Constitutional Standard:  Continuous Observation and Monitoring ............................................................ 37

E.    Liability of the County ................................................................................ 38

1.    Introduction ...................................................................................... 38

2.    Williamson County Policies, Practices, and Customs ....................... 39

3.    TCJS Records Demonstrating County Practices and/or Customs ....... 42

4.    Other Deaths at the County Jail ....................................................... 46

III.    Causes of Action .................................................................................................... 48

A.    14th Amendment Due Process Claims Under 42 U.S.C. § 1983: Objective Reasonableness Pursuant to *Kingsley v. Hendrickson* ..................................... 48

B.    Remedies for Violation of Constitutional Rights ........................................... 49

C.    Cause of Action Against Individual Defendants Under 42 U.S.C. § 1983 for Violation of Constitutional Rights ............................................................ 49

D.    Cause of Action Against the County Under 42 U.S.C. § 1983 for Violation of Constitutional Rights .............................................................................. 53

IV.    Concluding Allegations and Prayer ........................................................................ 56

A.    Conditions Precedent ................................................................................... 56

B.    Use of Documents at Trial or Pretrial Proceedings ...................................... 56

C.    Jury Demand ............................................................................................... 56

D.    Prayer ......................................................................................................... 56

TO THE HONORABLE UNITED STATES DISTRICT COURT:

Plaintiffs file this complaint and for cause of action will show the following.

I.      Introductory Allegations

        A.      Parties

1.      Plaintiff Cindy McNatt ("Cindy McNatt" or "Ms. McNatt") is a natural person.  Ms. McNatt was Joshua Ray McNatt's natural and legal mother.  John McNatt ("John McNatt" or "Mr. McNatt") was Joshua Ray McNatt's natural and legal father.    Minor T.R.M. is Joshua Ray McNatt's natural and legal son.  Minor S.M., a male, may be Joshua Ray McNatt's son.  Decedent Joshua Ray McNatt is referred to herein at times as "Josh" or the "decedent."  Ms. McNatt sues in her individual capacity and as the Dependent Administrator of the Estate of Joshua Ray McNatt, Deceased.  Ms. McNatt, when asserting claims in this lawsuit as the dependent administrator, does so in that capacity on behalf of all other wrongful death beneficiaries (including John McNatt, minor T.R.M., and, to the extent necessary and/or legally appropriate, minor S.M.), and she seeks all wrongful death damages available to all such persons.  Those wrongful death beneficiaries are collectively referred to herein as the "Wrongful Death Beneficiaries."  Ms. McNatt also sues in that capacity asserting claims on behalf of the estate and all of Josh's heirs (including Josh's heirs-at-law, including minor T.R.M. and, potentially, minor S.M.).  All such heirs are collectively referred to herein as the "Claimant Heirs."  Ms. McNatt asserts claims on behalf of and seeks all survival damages and wrongful death damages respectively available to Claimant Heirs and Wrongful Death Beneficiaries, to the extent allowed by law.  Ms. McNatt also sues in her individual capacity and seeks all wrongful death damages available to her.  Ms. McNatt qualified or was expected to be qualified as estate administrator in or about January 2023, in Cause Number

22-0343-P, in the County Court at Law of Hays County, Texas, in a case styled *Estate of Joshua Ray McNatt, Deceased.*

2.      Defendant Williamson County, Texas ("Williamson County" or the "County") is a Texas county.  Williamson County may be served with process pursuant to Federal Rule of Civil Procedure 4(j)(2) by serving its chief executive officer, Honorable County Judge Bill Gravell, Jr., at 710 S. Main Street, Suite 101, Georgetown, Texas  78626, or wherever Honorable County Judge Bill Gravell, Jr. may be found.  Service on such person is also consistent with the manner prescribed by Texas law for serving a summons or like process on a county as a Defendant, as set forth in Texas Civil Practice and Remedies Code Section 17.024(a).  The County acted or failed to act at all relevant times through its employees, agents, representatives, jailers, and/or chief policymakers, all of whom acted under color of state law at all relevant times, and is liable for such actions and/or failure to act to the extent allowed by law (including but not necessarily limited to law applicable to claims pursuant to 42 U.S.C. § 1983).  The County's policies, practices, and/or customs were moving forces behind and caused, were proximate causes of, and were producing causes of constitutional violations and resulting damages and death referenced in this pleading.

3.      Defendant Brandon W. McBay (sometimes referred to herein as "Mr. McBay" or "Jailer McBay") is a natural person who resides and is domiciled in Texas.  Brandon W. McBay may be served with process at his dwelling / usual place of abode, 2001 E. 18th Street, Georgetown, Texas  78626.  He may also be served at his work address, which is believed to be Williamson County Jail, 306 W. 4th Street, Georgetown, Texas 78626.  He may also be served with process wherever else he may be found or, pursuant to Federal Rule of Civil Procedure 4(e), by leaving a copy of this complaint and a summons directed to Mr. McBay at his dwelling or usual place of abode with someone of suitable age and discretion who resides there.  Mr. McBay is being sued in

his individual capacity, and he acted at all relevant times under color of state law.  His actions and inaction were moving forces behind, caused, and proximately caused constitutional violations and resulting damages and death referenced in this pleading.  Mr. McBay was employed by the County at all such times and acted or failed to act in the course and scope of his duties for the County.

4.    Defendant Jimmy D. Mobley (sometimes referred to herein as "Mr. Mobley," "Jailer Mobley," and/or "Sergeant Mobley") is a natural person who resides and is domiciled in Texas.  Jimmy D. Mobley may be served with process at his dwelling / usual place of abode, 2313 Broken Wagon Dr., Leander, Texas  78641.  He may also be served at his work address, which is believed to be Williamson County Jail, 306 W. 4th Street, Georgetown, Texas 78626.  He may also be served with process wherever else he may be found or, pursuant to Federal Rule of Civil Procedure 4(e), by leaving a copy of this complaint and a summons directed to Mr. Mobley at his dwelling or usual place of abode with someone of suitable age and discretion who resides there.  Mr. Mobley is being sued in his individual capacity, and he acted at all relevant times under color of state law.  His actions and inaction were moving forces behind, caused, and proximately caused constitutional violations and resulting damages and death referenced in this pleading.  Mr. Mobley was employed by the County at all such times and acted or failed to act in the course and scope of his duties for the County.

5.    Defendant Sara E. Pecorilla (sometimes referred to herein as "Ms. Pecorilla" or "Medical Officer Pecorilla") is a natural person who resides and is domiciled in Texas.  Sara E. Pecorilla may be served with process at her dwelling / usual place of abode, 2323 Wolf Ranch Parkway, Apartment 339, Georgetown, Texas  78628.  She may also be served at her work address, which is believed to be Williamson County Jail, 306 W. 4th Street, Georgetown, Texas 78626.  She may also be served with process wherever else she may be found or, pursuant to Federal Rule

of Civil Procedure 4(e), by leaving a copy of this complaint and a summons directed to Ms. Pecorilla at her dwelling or usual place of abode with someone of suitable age and discretion who resides there.  Ms. Pecorilla is being sued in her individual capacity, and she acted at all relevant times under color of state law.  Her actions and inaction were moving forces behind, caused, and proximately caused constitutional violations and resulting damages and death referenced in this pleading.  Ms. Pecorilla was employed by the County at all such times and acted or failed to act in the course and scope of her duties for the County.  All natural person Defendants in this case (Brandon McBay, Jimmy Mobley, and Sara Pecorilla) are collectively referred to in this complaint as the "Individual Defendants."

#### B.    Jurisdiction and Venue

6.    The court has original subject matter jurisdiction over this lawsuit according to 28 U.S.C. § 1331 and 1343(4), because this suit presents a federal question and seeks relief pursuant to federal statute(s) providing for the protection of civil rights.  This suit arises under the United States Constitution and 42 U.S.C. § 1983.

7.    The court has personal jurisdiction over the County because it is a Texas county. The court has personal jurisdiction over Individual Defendants because they reside and is or are domiciled in, are citizens of, and/or have sufficient contacts with Texas.

8.    Venue is proper in the Austin Division of the United States District Court for the Western District of Texas, pursuant to 28 U.S.C. § 1391(b)(2).  A substantial part of the events or omissions giving rise to claims in this lawsuit occurred in the County, which is in the Austin Division of the United States District Court for the Western District of Texas.

## II.    Factual Allegations

A.    Introduction

9.    Plaintiff provides in factual allegations sections below the general substance of certain factual allegations.  Plaintiff does not intend that those sections provide in detail, or necessarily in chronological order, any or all allegations.  Rather, Plaintiff intends that those sections provide Defendants sufficient fair notice of the general nature and substance of Plaintiff's allegations, and further demonstrate that Plaintiff's claim(s) have facial plausibility.  Whenever Plaintiff pleads factual allegations "upon information and belief," Plaintiff is pleading that the specified factual contentions have evidentiary support or will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.  Moreover, where Plaintiff quotes a document, conversation, or recording verbatim, Plaintiff has done Plaintiff's best to do so accurately and without any typographical errors. However, some typographical errors may still exist.  Plaintiff also pleads facts with give rise to conditions of confinement and/or episodic acts and/or omissions claims, as appropriate, and asks that the court apply the correct legal theory or theories to the facts plead.  Plaintiff also at times pleads in the alternative allegations which are seemingly inconsistent.  Plaintiff is not pleading Plaintiff's "best case" and will only be able to do so after discovery.  Plaintiff does not intend to "stand" on this pleading but will seek leave to amend as further facts are developed, or in the event any court determines that Plaintiff's live pleading is any manner deficient.

B.    Josh's Predictable Suicide in the County Jail

10.    Individual Defendants' deliberate indifference and objective unreasonableness in their actions and inaction caused, were proximate causes of, and were producing causes of Josh's suffering and death.  This section of the complaint provides only some material facts related to

Josh's suicide.   Plaintiff sets forth other material facts related to Josh's suicide in other sections of the complaint.

11.    Josh was suicidal.  All Defendants knew it.  Even so, and even though Josh was on suicide watch, certain Defendants either provided or allowed to be provided to Josh items with which he could form a ligature, and moreover placed or allowed Josh to be placed or left in a cell, alone and unwatched, with tie-off points.  They thus sealed Josh's fate.  Josh predictably made a successful suicide attempt on April 12, 2021.  It is patently unconstitutional to put a suicidal person into a cell, with tie-off points, and items with which the person can form a ligature.  This was clearly established as of the time of Josh's suicide.

### 1.    Josh's Prior Jail Incarcerations

12.    The County was well aware of Josh's mental health issues, including suicidal tendencies, as a result of prior incarcerations.  Upon information and belief, one or more Individual Defendants were also aware of information from Josh's prior incarcerations.  In the alternative, if the policy, practice, and/or custom of the County was such that individuals working in the jail would not be aware of information obtained from prior incarcerations, this supports liability against the County.

13.    On August 14th, 2001, Josh was booked into the Williamson County jail. During booking, Josh disclosed that he had received MHMR services or other mental health services for depression. Josh also answered, "Yes" In response to the question, "Have you ever attempted suicide or had thoughts about killing yourself?" Josh further indicated that he had either attempted suicide or had thoughts about killing himself the prior year. He said that he had done so because

of depression, and he had attempted suicide or thought about attempting suicide through a drug overdose.

14. On May 7th, 2002, Josh was booked into the Williamson County jail. A booking document indicates that Josh responded "no" to the same questions that to which he responded "yes" during that August, 2001 booking. Upon information and belief, in the alternative, this was due to the jail not having in place a policy, practice, and or custom of communicating to intake and or booking personnel prior information received about an inmate.

15. The same issue appeared to have occurred during an August 6th, 2002 booking of Josh into the jail, as well as a March 7th, 2003, booking into the jail. During the March 7th, 2003 booking, Josh indicated that he had received MHMR services or other mental health services, specifically counseling. However, no responses were recorded to the question about whether Josh had attempted suicide or thoughts about killing himself and, if so, when, why, or how? The same questions were also unanswered in a booking form for a March 14, 2003 incarceration.

16. On March 16th, 2004, Josh was once again booked into the jail. In response to the question about whether Josh had attempted suicide or thoughts about killing himself, he said, "Yes." He indicated that he had done so one year before, as a result of depression, he had either attempted suicide or thought about attempting suicide through cutting himself. Josh also indicated that he was thinking about killing himself that day, had been so down that he could not do anything for more than a week, and that he felt that way at that time.

17. On August 5th, 2005, Josh was once again booked into the County jail. The medical treatment form indicated that Josh was bipolar and took daily medications. It also indicated he was drug-addicted to marijuana and alcohol and had received treatment for same. The form also indicated that Josh had been treated for mental illness and had attempted suicide. The

suicide questionnaire indicated that Josh had received MHMR services or other mental health services. It also indicated that Josh heard noises or voices that other people do not seem to hear. The form also recorded that Josh had attempted suicide, when he was 13 years old, because he was "mad at the world."  He had done so through a "pills overdose."  Josh also indicated that he had been "so down" that he could not do anything for more than a week, that he felt that way at the time of booking, and when not on drugs or drinking, had gone for days without sleep, or had a long period in his life when he felt very energetic or excited.

<u>2.    Josh's Incarceration Concluding in his Death</u>

18.    A Texas Commission on Jail Standards ('TCJS') intake form was completed at booking, at the beginning of Josh's final incarceration in the County jail. The TCJS specifies use of this Screening Form for Suicide and Medical/Mental/Developmental Impairments and requires that it be completed for all detainees immediately upon admission to a county jail facility.  Further, jail staff should perform additional screenings when they have information that a prisoner has developed mental illness, or the inmate becomes suicidal, at any point during the inmate's incarceration.  A jail must maintain any such additional screening forms in a prisoner's file.  This assessment would not occur for days.

19.    The completed TCJS form contained information demonstrating that Josh was suicidal. A magistrate signed, on April 9, 2021, an order for a legally-required assessment of Joshua. The order indicated that Bluebonnet Trails in Williamson County, a local mental health facility, was to conduct the assessment. This assessment would not occur for days.  The assessment, more fully described below, indicated that Joshua should remain on suicide watch. However, for the County, a suicide watch was not continuous. According to cell check records, it appears that, generally, cell checks were to be conducted every roughly 17 to 23 minutes. It takes

only a couple of minutes to form and use a ligature. Thus, anything short of continuous monitoring of a suicidal inmate was unabashed deliberate indifference. Moreover, when combined with putting such a person into a cell with tie off points and items with which the person could form a ligature, it was a death sentence.

20.    A medical intake document for Josh's April 9, 2021 incarceration listed a number of issues. The document had "yes" answers to the following queries: mental illness; mental illness bipolar; mental illness depression; and mental illness anxiety. This information was in addition to that included on the TCJS intake form referenced elsewhere in this pleading.  A document entitled "Williamson County Magistrate's Information" related to charges for which Josh was being held listed "known serious mental problems" as paranoid schizophrenia, bi-polar, anxiety, and depression. Under the "domestic violence risk assessment" section, boxes were checked for items including the following: suspect has destroyed cherished personal items; suspect contemplated/threatened suicide; and suspect uses illegal/abuses legal drugs.  There is little doubt that Williamson County, and upon information and belief Individual Defendants, knew of Josh's serious mental health (including self-harm) issues.

21.    Williamson County Medical Supervisor Douglas Wheless drafted a "Timeline for Medical Issues Regarding Inmate Joshua McNatt." The timeline indicates that, when Josh was booked into the jail on April 9, 2021, he had been "medically cleared" at St. David's Georgetown Hospital for an elbow injury.  This was not a full medical clearance, nor did it address Josh's serious mental health issues.  It was merely for his elbow injury.

22.    The timeline moreover indicates that, at the time of booking, Josh had been "prescribed several psychotropic medications." Medications listed in the timeline include Cymbalta, Zyprexa, and Trazodone.  As, upon information and belief, all Defendants knew,

Cymbalta is used to treat, in part, depression and anxiety; Zyprexa (Olanzapine) is used to treat certain mental/mood conditions (such as schizophrenia and bipolar disorder); and Trazadone is used to treat depression. The timeline also indicates that, pursuant to Texas law, a mental health assessment was ordered. The jail started Josh on 25 milligrams of Librium, three times each day, "for his anxiety and possible detoxification from his drug use." Josh was initially housed in the infirmary for monitoring. Thus, upon information and belief, all Defendants knew that Josh was at a significant risk of suicide.

23.     On April 10, 2021, Josh was moved from the infirmary to the South jail. On April 11, 2021, Josh remained in the South jail and was purportedly receiving Librium.

24.     On April 12, 2021, at 10:39 AM, Josh was moved from the south jail cell B3-4 to B9L-1 due to him making threatening statements to officers and saying that he would "go off" on others in his tank if he did not receive his medications. Upon information and belief, he was referring to his needed mental health medications. Between 12:30 PM and 12:55 PM that day, Josh was seen by MHMR Representative Naomi Padilla. Qualified Mental Health Professional ("QMHP") Padilla recommended that Josh remain on suicide watch. Josh left the medical department roughly two minutes after completion of the MHMR interview, and he was returned to cell B9L-1.

25.     QMHP Padilla completed a three-page form entitled Bluebonnet Trails Community Services Court-Ordered Assessment. Her signature was dated April 12, 2021 at 11:15 PM. The form indicated that Josh had current suicidal ideation. The form also indicated that Josh felt angry and had been determined to have a mental illness or as being a person with an intellectual disability within the prior year. QMHP Padilla also indicated that Josh had bipolar disorder and substance

use disorder. Bipolar disorder is a significant indicator for suicidal tendencies, especially when combined with other issues such as those with which Josh suffered.

26.     QMHP Padilla also provided, in narrative form, her assessment. She indicated that Josh admitted to using methamphetamines a couple of days before, and that he received mental health services in 2019.  Josh said that he was currently receiving mental health services at Austin Integral Care. Josh told QMHP Padilla that he had been to several mental health hospitals, with his last hospitalization being only the prior week at Cross Creek Hospital . Ms. Padilla indicated that a BBT system indicated that Josh was diagnosed with bipolar 1 disorder and amphetamine-type substance use. Josh was currently on medications for his psychiatric issues, but he did not have his medications in the jail. Josh also indicated that he had been to rehab. Equally troubling, with regard to suicidal tendencies, Josh said that he had at times visual and auditory hallucinations.

27.     QMHP Padilla recommended that Josh continue to be on observation, and that the inmate's MHMR hold continue. Upon information and belief, "observation" and the inmate's MHMR hold indicated that Josh needed to remain on suicide watch.  QMHP Padilla, in coming to her conclusions, did so through both an interview with Josh and a review of psychiatric records.

28.     When a person is put on suicide watch in a jail, the person should be clothed with a suicide smock or other suicide prevention clothing.  Such clothing is designed to not be easily modified to form a ligature.  Moreover, when a person is put on suicide watch in a jail, the jail should not put the person into a cell with tie-off points from which a ligature could be used.  Thus, a person on suicide watch should not be put into a cell which contains items with which the person can form a ligature, and which also contains tie-off points.  This is because, as all Defendants knew, the most common manner in which inmates in jails and prisons commit suicide is through use of a ligature.  All Defendants knew, and it is common knowledge in the corrections industry,

that putting a suicidal person into a cell under such conditions is wholly outside the standard, usual and customary practice.  Moreover, pursuant to Fifth Circuit authority, doing so constitutes deliberate indifference to the health and safety of the inmate.

29.    Roughly 20 minutes later, at approximately 1:20 PM, a cell check was conducted. Shockingly, approximately eight minutes later, a jail floor officer dropped off a bag of towels, sheet(s), and a blanket to Josh.  Every competent jailer knows that suicidal inmates will use clothing, sheets, towels, and bedding to form ligatures to die by suicide.

30.    The County timeline indicates that, roughly 18 minutes later, a cell check was conducted. The timeline also indicates that, at 2:13 PM, "Although on a suicide watch, Mr. McNatt was found hanging in the cell by jail staff during the next suicide watch check." Leaving Josh, who was undisputedly suicidal, in a cell with tie-off points and items with which he could form a ligature, was a violation of every known jail standard as well as clearly established law.  All competent jailers knew this.

31.    The Williamson County Sheriff's Office investigated Josh's death. The County indicated to local news media that Josh attempted suicide on April 12, 2021 and was transported by EMS to a local hospital. The County also indicated that two days later, on April 14, 2021, the County released Josh from custody. The County said that it did so so that family members could decide on his future care. However, upon information and belief, the true motive was to avoid the County's liability for Josh's medical expenses. Josh passed away at the hospital.

### 3.    Witness Statements

32.    Plaintiff lists in this section of the complaint relevant summaries of some material portions of statements, provided by some individuals.  Plaintiff intends that information in this

section of the pleading, along with all other information in this pleading, support and give notice of plausibility of Plaintiff's claims.

<u>a.    Barnett, Ronald – Medical Sergeant</u>

33.    Medical Sergeant Ronald Barnett (#12859) wrote a statement related to Josh's death. He indicated that, on April 12th, 2021, at approximately 2:14 PM, while on duty at the Williamson County jail, he heard a back-up call for Third South. He ultimately responded to Josh's cell and assisted and/or documented what was occurring.

<u>b.    Bradburn, Michael – Jailer</u>

34.    Jailer Michael Bradburn provided a statement related to Josh's death. Officer Bradburn indicated that, April 12, 2021, he was assigned to 3rd South, Building C in the Williamson County jail, during A-Shift operations. He heard, approximately at 2:13 PM, a back-up call come over the radio. He heard Deputy Fernando Ortiz (#15297) call for medical backup due to an inmate hanging himself in B9L-01. Sergeant Jimmy Mobley (#12039) and Jailer Bradburn exited the 3rd-floor South area using elevator number three. When they arrived at Josh's cell, they saw Josh laying on the floor, unresponsive. Presumably, Josh had already been cut down. Jailer Bradburn saw Officer Valerie Rodriguez (#14371) performing chest compressions. He also saw at some point Officer Austin Braune standing by to take over chest compressions.  He also heard over the radio Lieutenant Michael Brumleve ask for the location of Josh's suicide attempt.

<u>c.    Braune, Austin - Jailer</u>

35.    Jailer Austin Jay Braune (12239) provided a brief statement related to Josh's death. Jailer Braune indicated that, on April 12, 2021, he was stationed in Q-Pod on the third floor of the North Jail at the Williamson County jail. When he was returning from break at approximately 2:15

PM, he heard a request for backup to Second South. He arrived at Josh's cell and saw that Josh had already apparently been cut down and was laying on the floor. Officer Braune saw occurrences inside of Josh's cell.

### d.    Brumleve, Michael - Lieutenant

36.    Lieutenant Michael Brumleve wrote a brief statement related to Josh's death. He indicated that, on April 12, 2021, at approximately 2:13 PM, he was assigned to A-Shift operations at the Williamson County Jail. He was working as "the shift supervisor." He was in booking when he heard a call that backup was needed to second floor South. He responded to Josh's cell and was present during the provision of chest compressions and/or other lifesaving techniques. He began video recording what was occurring, as Sergeant Mobley and Medical Officers Miller, Pecorilla, Watson, and Forhan began to give medical aid to Josh.

### e.    Forehand, Rex – Medical Officer

37.    Medical Officer Rex Forehand (#15290) provided a brief statement related to Josh's death. Medical Officer Forehand indicated that he responded to a back-up call on April 12th, 2021. That call was regarding Josh's suicide attempt by hanging. Medical officer Forehand responded to the cell and assisted other personnel attempting to save Josh's life.

### f.    Frank, John – Property Officer

38.    Property Officer John Frank provided a statement related to Josh's death. He indicated that, April 12th, 2021, he was assigned to "Property" in the Williamson County jail during day shift operations. As he was walking through a specific corridor, he overheard on the radio, at approximately 2:15 PM, that Deputy Fernando Ortiz (#15297) was calling for backup on the Second South floor to B9L-01. Since Property Officer Frank was near that floor, he headed to

the cell to see if he could help. He indicated that the main reason he responded was due to him initially being a corrections officer for over a year. It was his natural instinct to respond.

### g.    McBay, Brandon - Jailer

39.    Jailer Brandon McBay (#15337) provided a statement related to Josh's death. Jailer McBay indicated that, April 12, 2021, he was assigned to the Second South floor officer with A-shift operations. He indicated that, at approximately 10:42 AM, Sergeant Jimmy Mobley (#12039) from the Second South picket said that Josh was having a psychotic episode. When he entered B3, he saw Josh. Josh asked when medical was coming around for med-pass. Jailer McBay indicated that he asked Josh what was wrong. Jailer McBay wrote, "He seemed frantic and out of breath." Jailer McBay also said that Josh said, "I'm off my medicine and I'm having an episode." Jailer McBay indicated that Sergeant Mobley instructed him to re-house Josh.  Jailer McBay and Sergeant Mobley spoke to Josh briefly and indicated that he would need to be re-evaluated by medical and probably need to see MHMR. Jailer McBay then put Josh into housing cell B9L-01. Upon information and belief, both Jailer McBay and Sergeant Mobley knew that there were no other inmates on that run of cells.  They also knew that it violated all known jail standards to place a suicidal person into an area, with items with which he can form a ligature, and with tie-off points. Moreover, they also knew that such an inmate should be placed into an area where there are other inmates who could see the inmate and thus alert staff in the event of a self-harm incident.

40.    Oddly, in the middle of his statement, Jailer McBay wrote, "I did not give inmate McNatt his sheet, blanket, or towel until he was cleared from MHMR and not put onto constant watch." This statement was out of place, chronologically and contextually. It is, upon information and belief, false in indicating that the qualified mental health professional somehow took Josh off of a suicide watch. This is untrue based upon other evidence. Thus, upon information and belief,

Jailer McBay gave Josh at least a sheet, blanket, and towel while he knew Josh was on suicide watch, and when he knew that Josh was housed, alone, without being in eyesight of any other person, in a cell with tie-off points. This violated all known jail standards and clearly established law.

41.    Jailer McBay continued in his statement. He indicated that, "At approximately 11:03 AM, Medical Officer David Miller came onto the 2nd floor South to talk to Josh. Medical Officer Miller said that Josh needed to see MHMR. Jailer McBay indicated that, at approximately 12:40 PM, Medical Officer Sara Pecorilla (#15388) came on to 2nd floor south to take two inmates (including Josh) to see a qualified mental health professional (MHMR). Jailer McBay further indicated that, at approximately 1:00 PM, Medical Officer Pecorilla "dropped off" Josh "back off to 2nd floor South." Jailer McBay falsely indicated, upon information and belief, that he knew that Josh had been "cleared by MHMR." As indicated, upon information and belief, no such "clearance" occurred.  Josh was to remain on suicide watch.  Jailer McBay indicated that he "got authorized by Sergeant Mobley to give inmate McNatt back his towel, sheet, and blanket." Thus, both Jailer McBay and, upon information and belief, Sergeant Mobley knew that Josh was suicidal, on suicide watch, kept in a single cell, not in eyesight of any other person, with available tie-off points, and with multiple items with which he could form a ligature. To no one's surprise, Josh in fact did that, and used a tie-off point in the cell for his unfortunately successful suicide attempt.

42.    Jailer McBay continued in his statement by indicating that, at approximately 2:00 PM, Deputy Ortiz Fernando (#15297) came on to 2nd floor South to give Jailer McBay a 20-minute break. Jailer McBay wrote, "Before walking off the floor to take my break my Guardian 15-minute timer went off. I was about to hit a round, but Deputy Ortiz said, 'I got it, man. Go take your break!' My last round I hit on the Guardian was at 1346 hours. I went down the 2nd floor

South elevator to Slider 14 and went to my car. Soon as I got into my car, 'back up to 2nd South 9L' came over the radio and I knew immediately who it was." Thus, Jailer McBay indicated that it was no surprise at all that Josh committed suicide using items with which he could form a ligature provided by Jailer McBay with the permission of Sergeant Mobley.

43.    Investigator B.C. Bearden, with the Round Rock Police Department, also interviewed Jailer McBay.  This interview occurred well after Josh's suicide. Thus, on May 3, 2021, at approximately 10:11 AM, the interview began at the Williamson County Sheriff's Office. Jailer McBay was accompanied by his CLEAT Attorney, Alyssa Urban. Williamson County Sheriff's Office detective Pete Parks was also present.

44.    Jailer McBay indicated that, on April 12, 2021, he was assigned to Second South at the Williamson County jail. He said that only he and Sergeant Mobley were working that area. He said that Sergeant Mobley was manning the control room when he received an intercom message from Josh. Sergeant Mobley conveyed that message to Jailer McBay. Sergeant Mobley told Jailer McBay that Josh told Sergeant Mobley that Josh was having a psychotic episode. Jailer McBay went to visit Josh, and Josh told jailer McBay that he needed his medication "and did not know if he was going to hurt himself or he doesn't know what's going to happen." Jailer McBay pulled Josh from the cell and took him to Sergeant Mobley. Josh spoke to Sergeant Mobley, saying he was worried about his girlfriend, that he had not had his medication, and similar issues. Jailer McBay said "inmate McNatt never made direct threats or mention of suicide, but you could tell it was getting to that."

45.    "They decided not to give inmate McNatt his possessions (sheet, blanket, towel, etc.) from his other cell before he was checked by medical in MHMR." Upon information and belief, either this was false, or in the alternative the assertion that after the MHMR check Josh was

not to remain on suicide watch was false. Regardless, medical officer Miller came and spoke with Josh for, allegedly approximately 45 minutes, with the result being that Josh needed his mental health medication.

46.     Medical officer Miller put Josh on the list to see MHMR. Within an hour or two, according to Jailer McBay, Josh was transferred to see the MHMR qualified mental health professional mentioned elsewhere in this pleading. Allegedly, after Josh was brought back to the unit by Medical Officer Pecorilla, Officer Pecorilla stated that he was "good" and that his items could be returned to him. Upon information and belief, this assertion may be false.  As indicated elsewhere in this pleading, Medical Officer Sara Pecorilla indicated, after QMHP Padilla evaluated Josh, that Josh's suicide watch was "to be continued."  Upon information and belief, either Jailer McBay or in the alternative Officer Pecorilla did not tell the truth about what occurred.  Depending on what the jury believes, and for purposes of indulging all inferences in Plaintiff's favor for purposes of this pleading, either could be liable independently for the failure to protect Josh after being told that Josh was to remain on suicide watch.  Upon information and belief, Medical Officer Pecorilla did nothing to assure that Josh was not left in a cell, with tie-off points, and items with which he could form a ligature.  In fact, as indicated elsewhere in this pleading, Medical Officer Pecorilla indicated that she returned Josh to his cell after the QMHP evaluation.

47.     Regardless, Investigator Bearden wrote, "This surprised CO McBay because he said other inmates that he has observed to be on direct observations have made fewer concerning statements than inmate McNatt." This evidenced Jailer McBay's knowledge that he needed to take effective action to protect Josh.  However, he chose not to do so. Investigator Bearden further wrote, "Per jail standards, inmate McNatt's items were returned to him in his cell."

48.     Jailer McBay further indicated that, at some point, deputy Ortiz arrived to provide Jailer McBay a 20-minute break. Jailer McBay told Jailer Ortiz that he was about to make his rounds, but Jailer Ortiz told him to go ahead and go on break. After Jailer McBay provided a quick brief of the floor, Jailer McBay "does not recall whether he notified Dep. Ortiz that inmate McNatt was in B9 L, but he was pretty sure he did not."  He further said that "as soon as he got to his car, he heard over the radio that staff needed backup to 9 left." "He said he knew exactly who it was, and he rushed back to the floor to assist." Investigator Bearden concluded his case supplemental report indicating that he had "found no discernible criminality" in Josh's death.  His report and investigation did not relate at all to potential constitutional violations.

### h.     Miller, David – Medical Officer

49.     Medical Officer David Miller indicated that, while on duty on April 12th, 2021, at approximately 2:13 PM, he heard a backup call for an attempted suicide by hanging. This referred to Josh's suicide attempt. He then responded by grabbing a stretcher from medical along with Medical Officer Rex Forehand (#15290). When Medical Officer Miller arrived at B9L-1, he saw that Josh had already been cut down and was laying on the floor (while Sergeant Mobley was performing CPR). He also saw that Josh was not alert or oriented, had discoloration around his neck, and was not breathing. Medical Officer Miller checked for a pulse, and there was none. He then obtained an AED and attempted to provide further lifesaving care.

### i.     Mobley, Jimmy – Jail Sergeant

50.     Sergeant Jimmy Mobley (#120389) was assigned on April 12, 2021 as an operations sergeant for A-Shift in the Williamson County jail. Sergeant Mobley responded, at approximately 2:13 PM, to a call for back-up to B9 run, located on Second South. He responded

with Officer Michael Bradburn (#15386). He saw Officer Valerie Rodriguez (#14371) performing CPR chest compressions on Josh, and he also saw that Josh was purple in color. He also saw Officer Gerardo Quiroz (#4162) standing in the cell. Sergeant Mobley took over for Officer Rodriguez on chest compressions until medical personnel arrived. Officer Austin Braune (#12339) had also responded and assisted Sergeant Mobley with chest compressions until medical personnel took over. Sergeant Mobley indicated that he assisted medics David Miller (#14809) and Kevin Watson (#14113) with six rotations of chest compressions until EMS personnel arrived. After EMS arrived, Sergeant Mobley took over video recording of the cell. He also returned to the scene later to take photos.

51.     Sergeant Mobley, in his statement, then wrote about events earlier that day. He wrote that, at approximately 10:42 AM, while providing a break to a control room officer at Second South, Josh called the Second South picket saying he needed his psych meds and needed to get out of the cell because he did not know what he was going to do and did not want to hurt anyone. Sergeant Mobley then instructed Officer Brandon McBay (#15337) to re-house Josh to a single cell. Officer McBay rehoused Josh to B9L-1. Sergeant Mobley wrote that, at the time, he was allegedly unaware that B9L run did not have any other inmates housed in the run and that Josh would be the only inmate housed there. He also wrote that, if he would have known that there were no other inmates housed in that run, he would have directed Josh to another cell. Upon information and belief, his allegation that he was unaware that there were no other inmates in that run of cells was false. Regardless, his assertion that he would have acted differently had he known of inmates not being in the area is a tacit admission that it was improper to house Josh, being suicidal, in an area with no other inmates. Moreover, this was a tacit admission that Sergeant Mobley knew that Josh was suicidal and needed protection.

52.     Sergeant Mobley also indicated in a statement that, at approximately 12:50 PM, he saw medic Sara Pecorilla (#15388) transporting Josh and another inmate to the medical department for an interview with QMHP Naomi Padilla. He also knew that Josh, after that interview, was returned to the same cell, on a run where there were no other inmates present.

j.      Ortiz, Fernando – Jailer

53.     Deputy Fernando Ortiz provided a statement related to Josh's death. Deputy Ortiz (#15297) indicated that, on April 12, 2021, he was working in booking at the Williamson County Jail. He indicated that, at approximately 2:00 PM, he went to Second South to conduct his second round break of the day for Officer McBay (15227). When Deputy Ortiz got to the Second South floor, he told Officer McBay that he was there to give him a break. Officer McBay provided a brief synopsis of what was going on on the floor and "stated that there was an in and out to be done on B6 left run." Officer McBay then left the floor. Deputy Ortiz changed his radio battery, grabbed the Guardian, and also grabbed a remote to do a channel check. He went to B3 and B4 tanks, scanned the tags, and did a channel change on B3 tank. He then went back to the officer's office to check a computer and see if he needed to scan other tags, or if he had missed one. After seeing the compliance monitor, he saw that "they had moved a person to B9 Left 1" since his first break in the morning. He saw that "it needed to be scanned." This was a reference to Josh, alone, in a single cell, on that run.

54.     Officer Ortiz then went to the B9 run, which is located right outside of the officer station on the right. When he walked into the run, he looked over to B9 Left 1 and saw Josh hanging from the bunk handle with a bed sheet tied around his neck.  The bunk handle is depicted on the first page of this pleading.  He then called for backup.

55.    Investigator B.C. Bearden also conducted an interview of Deputy Ortiz related to Josh's death. Deputy Ortiz said that he was working in booking on April 12, 2021 and "switched out" with Jailer McBay to give Jailer McBay a 20-minute break. Deputy Ortiz explained that the Guardian is a handheld electronic device that scans the code for the inmate cell to provide information on the inmate. It also allows you to input data that you have checked on the inmate at a specific time. Moreover, a jailer can take a photo of an inmate if the inmate is on an elevated suicide watch and further make notes of the inmate's condition. When scanning occupied cells, the Guardian system would send a signal notifying the central computer of the date and time of the last check. When scans are made, it places that inmate's information at the bottom of a monitor with a timer. Inmates who have not yet been checked will remain toward the top of the display. If they go overtime (30 minutes), the inmate's information turns red and an alarm is indicated.

56.    Jailer Ortiz further explained that there were different levels of watch for inmates from a basic level to a constant observation in the Williamson County Jail. A basic level watch requires visual observations and scans, a suicide watch involves taking a photo of the inmate and scanning the inmate's code, and there is a constant watch, or a person, usually a trustee, is sitting in front of the inmate's cell with constant eyes on the person. Oddly, Jailer Ortiz "was not sure what would distinguish when an inmate is placed in one level over another." He indicated that such was the responsibility of the jail classification group policy, practice, and custom. He also said that, on the most elevated level, an inmate's clothes are taken, an inmate is provided a smock "that prohibits suicide because it is stiff and cannot be wrapped around the neck."

57.    Jailer Ortiz also indicated that Josh was in possession of "his normal belongings for inmates in the jail." Josh had normal jail clothing, including an orange uniform which consisted of a shirt-type top, pants, and jail shoes. He also had a mattress, a towel, blanket, cover sheet,

toothbrush, shampoo, soap, toothpaste, and a comb. This made no sense for a person on suicide watch and violated every known jail standard. Jailer Ortiz admitted that, when conducting his rounds, and checking the monitor, that he missed making a timely check of Josh. Investigator Bearden wrote, "McNatt's name was still in a green status indicating that it was not overtime or within the two-minute warning time before 30 minutes had elapsed." Thus, according to jail policy, practice, and custom, even though Josh was on a suicide watch, he was not even being checked every few minutes or on constant watch.

### k.     Parks, Peter - Detective

58.     Detective Peter Parks, with the Criminal Investigation Division of the Williamson County Sheriff's office, provided a narrative related to Josh's death.  He indicated that, April 12, 2021, he was on duty in full uniform. Sergeant Pokorny contacted Detective Parks regarding Josh's attempted suicide. He said that Josh had done so in run B9-L1. He contacted C.S.U. Colby Hughey and went to cell B9-L1. When arriving, he contacted Officers Brandon McBay, Fernando Ortiz-Corrijo, and Sergeant Jimmy Mobley. When he arrived at the cell, he saw medical equipment and a white linen sheet that had been used as a ligature by Josh. When he entered the cell, among other things, he saw two metal steps and a handle used to assist inmates as they would get into a bunk built into the wall. He saw a white sheet tied to the metal handle, and that the sheet had been cut. This is the sheet which Josh had used, provided to him while he was on suicide watch, to commit suicide.

59.     Detective Parks noted that the handle which Josh had used was from 67 3/8" to 76 1/8" off the ground. Detective Parks, contrary to the assertion made in a custodial death report filed with the TCJS, flatly wrote, "McNatt has been on a suicide watch protocol since his arrival to the Williamson County jail on 04/09/2021." He also wrote that, while Josh was in pod B3, he

said that he needed his medication due to anxiety. He "started to cause a scene in the pod" and was thus re-housed to B9-L1. "B9-L1 is a single-person cell and there were no other inmates in any of the other cells in B9-L or B9-right. Thus, Josh was left alone, not continuously monitored, in a cell, with tie-off points, and multiple items with which he could make a ligature. Detective Parks also wrote that, at 12:41 PM, Josh was taken from B9-L1 to medical for an MHMR consultation. He noted that, as a result, Josh was noted to be diagnosed with bipolar disorder, as being depressed, and having anxiety.

60.     He further wrote that, at 1:46 PM Officer McBay checked on Josh and purportedly saw that he was "okay." Officer McBay was going on break at 2:00 PM and alleged briefed Officer Ortiz prior to that break. Officer Ortiz conducted rounds and went back to the office to check his computer and verify that he conducted all the checks that he needed to make. He then saw that he needed to check on Josh, in B9-L1, so he walked to the "officer's run" in B9. When he walked down that run, at approximately 2:13 PM, he saw Josh hanging from the bunk handle with a bed sheet.

61.     Detective Parks also went to the hospital at which Josh was receiving treatment. He went into an ICU room, and CSU Hughey photographed Josh. They saw redness and bruising to both of Josh's knees. They assumed that it was from Josh's knees hitting the metal walls of his cell as he was hanging. Upon information and belief, this was painful to Josh at the time.

62.     Investigator Parks also went to the jail medical section, on April 14, 2021, and spoke with Sergeant Barnett. Sergeant Barnett provided medical and jail documentation regarding Josh. Investigator Parks also learned that Josh had sent a jail email on April 12, 2021 at 10:25 AM, from pod 3, to medical which said, "I have not had meds. Having hard time telling what's real from fake. Need help ASAP. I am going to freak out." Sergeant Barnett indicated that, because he had

not received any confirmation from Cross Creek Hospital, Josh was not given any medication when he came to medical on April 12, 2021. Josh was allowed to remain in his delusional state and suffer as a result.

63.    Investigator Parks also obtained a written policy regarding when observations were to occur. The policy, regarding inmates such as Josh who were on suicide watch, read, "Observation shall be performed as near to one-five minutes as possible on all inmates who are placed on suicide watch or in a restraint device, with the understanding that the Post-Visual Inspection shall be made no later than 30 minutes apart as required by the Texas Commission on Jail Standards." A written policy that provides for anything short of constant monitoring, with a suicidal inmate, who is in a cell alone, with no other inmates around, with tie-off points, and items with which he can form a ligature, deliberately indifferent to detainee safety.

64.    Regardless, checks did not come even close to complying with the written policy. Upon information and belief, this is some evidence of a custom or practice that differed from the written policy. The Guardian tag was scanned for the following times, for cell checks of Josh: 13:12:18 by Officer Moody; 13:19:59 by Officer McBay; 13:46:30 by Officer McBay; and 14:13 by Officer Ortiz (when Josh was found having hung himself).

<u>l.    Pecorilla, Sara – Medical Officer</u>

65.    Medical Officer Sara Pecorilla (15388) provided a statement related to Josh's death. Upon information and belief, Officer Pecorilla did not have any type of medical license, such as a license to act as a nurse, physician's assistant, or physician. Thus, no co-workers could rely on any medical or mental health opinions she might have provided. The same is true, upon information and belief, for other County jail employees designated as "medical officers." Regardless, Officer Pecorilla indicated that, April 12th, 2021 she was assigned to the medical

department of the Williamson County jail for A-Shift operations. She indicated that, at approximately 10:30 AM, she was provided a list of inmates to be seen by qualified Mental Health Professional Naomi Padilla. QMHP Padilla was with Bluebonnet Trails. At approximately 12:40 PM, Officer Pecorilla retrieved Josh and escorted him from Second South to the medical department to be seen. Thus, there is no doubt that Medical Officer Pecorilla understood that there were no other inmates on the run with Josh. Contrary to the custodial death report filed with TCJS by Williamson County, Medical Officer Pecorilla wrote that, after Ms. Padilla's evaluation, "Naomi noted for his suicide watch to be continued . . . ." Medical Officer Pecorilla also wrote, "I returned inmate McNatt to his cell at approximately 1300 hours." No surprise to Ms. Pecorilla, or any Defendant, a little over an hour later, she heard backup being called to Josh's cell as a result of Josh hanging himself.

### m.    Price, Alexander - Deputy

66.    Deputy Alexander Solley-Price, with the Williamson County jail, provided a statement. He indicated that, on April 12, 2021, he was assigned to work booking inside the Williamson County jail. He heard, at approximately 2:13 PM, a back-up call for an inmate hanging in his cell on Second South. He gathered his equipment and reported to the old sallyport entrance located on the south side of the jail and awaited instructions. Deputy Solley-Price was instructed that he was to travel to Ascension Seton Williamson Hospital either with or to meet Josh at the hospital. Deputy Solley-Price made a number of observations. He also wrote, "It should be noted that during medical testing, the medical staff brought to my attention that inmate McNatt had what appeared to be self-harm scarring on his left wrist. I observed his wrist and found what I believe to be scars commonly seen in people dealing with high amounts of depression and suicidal

tendencies. Upon information and belief, all those working for the County, including Defendants, who interacted with Josh, saw such scarring before Josh's successful suicide attempt.

### n.    Rodriguez, Valerie – Jailer

67.    Jailer Valerie Rodriguez (#14133) provided a statement related to Josh's death. She indicated that she was assigned to work support operations at the Williamson County jail on April 12th, 2021. Her statement contains a typographical error, indicating that the occurrence was on February 12th, 2021. Regardless, at approximately 2:13 PM, Officer Rodriguez indicated that she heard a backup call for B9L-01 stating that there was a "hanging."

68.    When she arrived at Josh's cell, she saw Josh "hanging from his bunk with a white sheet tied around his neck. The sheet was secured on the handle bar that is located next to the bunk to assist inmates onto the top bunk." She also saw Deputy Ortiz attempt to cut the sheet, but the issued suicide hook knife did not work. They were ultimately able to cut Josh down and straighten Josh's body as he was laid on the floor-

### o.    Watson, Kevin – Medical Officer

69.    Medical Officer Kevin Watson (#14113) wrote a brief statement related to Josh's death. He indicated that, on April 12th, 2021, at 2:14 PM, he responded to a medical backup call regarding Josh's suicide attempt by hanging. Medical Officer Watson saw occurrences inside the cell after Josh was found.

### 4.    Death Reports

a.    Autopsy Report

70.    Satish Chundru, D.O., forensic pathologist with Hill Country Forensics LLC, conducted an autopsy of Josh.  Dr. Chundru determined that the cause of death was hanging, and the manner of death was suicide.

b.    Custodial Death Report (Filed with Attorney General)

71.    The County filed a custodial death report with the Attorney General of Texas. The report indicated that Josh was only 37 years old at the time of his death. It further indicated that Josh was originally in County custody on April 9th, 2021, and that Josh passed away at 2:22 AM on April 22, 2021.

72.    The report admitted that Josh's cause of death was suicide by hanging. The report further admitted that Josh exhibited mental health problems. Oddly, in response to the question, "Make suicidal statements?," the County wrote, "Unknown."

73.    The report contained a summary. The summary indicated that Josh was booked into the Williamson County Jail on April 9, 2021 after being arrested by Cedar Park Police Department. The report further indicated that, on April 12th, 2021, at approximately 2:13 PM., Williamson County Corrections Officer Fernando Ortiz was conducting rounds from the officer's run located in B9-L. The report indicated that the cell run allowed officers to walk through an area of cells that provided a view of inmates housed on both sides of B9-L. Josh was housed alone in Cell Number One of B9-L, with no other detainees housed in that run area.

74.    Jailer Ortiz saw that Josh was hanging from a bedsheet. The sheet was secured to the cell's bunk handle on one end, and tied around Josh's neck on the other.

75.    After jailer Ortiz found Josh, he called for assistance. Several other jailers heard jailer Ortiz's call for help and came to assist. Jailer Ortiz unlocked B9-L, and several officers went

to Josh's cell. The ligature was cut from the handle, and Josh was laid onto the floor. Georgetown Fire Department EMS ultimately arrived and transported Josh to Seton Williamson Emergency Room, 201 Seton Parkway, Round Rock, Texas 78665.

76.    After Josh was admitted at Seton Williamson Hospital, he was eventually moved to the intensive care unit and placed on life support. Upon information and belief, medical staff determined that Joshua had no or insufficient brain activity to continue living.

77.    The County decided to release Josh from custody, and a district court judge, on April 14th, 2021 at approximately 5:25 PM released Joshua from custody. Joshua was taken off of life support and passed away on April 22nd, 2021 at 2:22 AM.

78.    Williamson County Precinct No 2 Justice of the Peace Edna Staudt ordered an autopsy. Josh was an organ donor. On April 22, 2021, the Round Rock Police Department Criminal Investigations Division was contacted. It agreed to conduct a parallel investigation with Williamson County Detective Peter Parks.  Interestingly, the custodial death report provided no information at all about events leading up to Josh's suicide.

c.    Inmate Death Report (Filed with Texas Commission on Jail Standards)

79.    The Williamson County Sheriff's Office filed an Inmate Death Reporting Form with the TCJS.  The form indicates that Josh was not on suicide watch at the time he made his fatal suicide attempt. Upon information and belief, this was false. As a result of checking the box indicating that Josh was not on suicide watch, the County was not required to list the date and time of the last check of Josh. The form also indicates that there was no video evidence available for the area in which the "death occurred." The form gave short shrift to all known medical conditions, listing only methamphetamine abuse, anxiety, and elbow bursitis. The listed investigating officer/agency was Sergeant Blake Bearden with the Round Rock Police Department.

C.     Investigation by Texas Commission on Jail Standards

80.     The TCJS specifies minimum jail standards.  Those standards do not even come close to addressing all details of what happens in Texas county jails, and they are not designed and were not implimented to do so.  They also do not detail or direct that specific medical and/or mental health care be given to inmates in certain circumstances.  Thus, jails and jailers can violate the Constitution, even if they do not violate certain, specific minimum standards.  However, violation of a standard can be some evidence of a constitutional violation.

81.     The TCJS conducted an investigation of Josh's death, as it does with all in-custody county jail deaths in Texas. The TCJS uses a death in-custody review checklist, and the checklist includes any notation regarding violation of minimum jail standards. Minimum jail standards are simply some standards which the TCJS has in place regarding some issues potentially occurring in county jails. Those standards are not synonymous with constitutional standards, and just because a minimum jail standard is not violated does not mean that there was not a constitutional violation. Compliance with minimum jail standards is not evidence that the Constitution was not violated.

82.     TCJS Executive Director Brandon Wood handwrote on the checklist, "Issuance of linens to i/m on sw [suicide watch] seems counter intuitive, but if i/m [inmate] was in standard uniform & not smock, little difference. Would be good example when discussing suicide prevention tactics." Thus, Executive Director Wood was noting that either a standard jail-issued uniform, or linens, could be, and commonly are, used as ligatures by a person who is suicidal. All Defendants knew this.  Thus, Executive Director Wood was noting that essentially Defendants added insult to injury, by adding to the ability of Josh to use his standard-issued jail uniform as a ligature, the further ability to not remove any portion of his uniform and instead use jail-provided linens to die by suicide.

83.     The summary contained in TCJS records of some facts related to Josh's suicide provided some information in the Screening Form for Suicide and Medical/Mental/Developmental Impairments. The form indicated that Josh had a serious injury or hospitalization in the prior ninety days and was also taking prescription medications. Those prescription medications including, Cymbalta, Zyprexa, and Trazodone. These medications were not in Josh's possession at the time of arrest. The form also indicated that Josh appeared to be under the influence of alcohol, and he had an abuse history of methamphetamines. The form also indicated that Josh had received mental health services for emotional or mental health problems just three days before, through Cross Creek Hospital. The form also indicated that Josh had been hospitalized for emotional/mental health issues in the prior year, at Cross Creek Hospital. The form further indicated that Josh had been diagnosed with bipolar disorder, depression, and anxiety. Further, the form indicated that Josh had been told by teachers that he had learning difficulties.

84.     The form also indicated that the Continuity of Care Query ("CCQ") returned an "exact" match. A CCQ is used to determine whether a person has received inpatient mental health services. As a result, a magistrate outside the jail, and mental health, were notified.

85.     The summary also indicated that Josh was started on Librium, which is an anxiety and detoxification medication. A communication was sent to Cross Creek to confirm Josh's medications, and Josh was properly placed on suicide watch.

86.     The TCJS inspector, Jon Luna, reviewed related paperwork. Assistant Director Wisneski signed off on the two-page summary. The summary included a timeline, some material portions of which indicated:

- On April 9, 2021, Josh was given a Librium injection at approximately 9:43 AM. This was for Josh's anxiety while medical staff awaited direction and confirmation of

oral medications from Cross Creek Hospital. Josh made threatening statements toward others, but allegedly stated no suicidal plan at that time.

- On April 9, 2021 at approximately 12:09 PM, Williamson County jail medical staff faxed a request to Cross Creek Hospital regarding Josh's information. Josh was properly placed on suicide watch.

- On April 10, 2021, Josh was moved from the infirmary, where he was on suicide watch, to the south jail for housing and was purportedly compliant with Librium medication.

- On April 11, 2021, the jail failed to document any issues with Josh.

- On April 12, 2021, at approximately 10:39 AM, Josh was relocated in the jail due to threatening statements against staff after requesting his medications.

- On April 12, 2021, at approximately 11:14 AM, Josh signed for receipt of Librium.

- On April 12, 2021, between approximately 12:30 PM and 12:55 PM, Josh was seen by MHMR. He received a recommendation that he remain on suicide watch.

- On April 12, 2021, only approximately two minutes after MHMR completed the interview of Josh and recommended that he remain on suicide watch, Josh was returned to his cell.

- Approximately eight minutes later, shockingly, Williamson County jail staff provided linens to suicidal Josh.

- No surprise to anyone, approximately 45 minutes later, Josh was found hanging in his cell. Josh had used the provided linens, tying one end off onto a handle attached to a metal cell wall and using the other end to tie a ligature around his neck. EMS transported Josh to Seton Williamson Hospital.

- On April 14, 2021, the County released Josh from custody.

- On April 22, 2021, Josh died as a result of injuries he sustained in the suicide attempt while he was on suicide watch in the jail.

D.    Defendants' Knowledge and Education

    1.    Jail Suicides are a Known, Widespread Problem.

87.    Defendants knew that detainees frequently commit suicide through hanging and/or asphyxiation, using items in their cells to form ligatures.  They also knew that this is the most common method for prisoners to commit suicide.  Individual Defendants possessed this knowledge simply from watching movies in which suicide occurs, reading, viewing, and hearing news media reports, hearing and reading about jail death lawsuits, and through their jail experience, training, and/or education.  Thus, Defendants should not have allowed the decedent to have in the cell items with which the decedent ultimately committed suicide.

88.    Jail suicides, as all Defendants knew before incarcerating the decedent, are a huge problem in the United States.  Suicides in local jails across the United States increased thirteen percent from 2001 to 2019.  Between 2010 and 2019, suffocation, including hanging and self-strangulation, accounted for nearly ninety percent of suicide deaths in local jails.  Between 2015 and 2019, approximately twelve percent of deaths by suicide in local jails occurred within the first 24 hours of incarceration.  Further, from 2015 to 2019, two-thirds of local jail suicides occurred within the first 30 days of incarceration, while forty-four percent occurred within the first week of incarceration.  Defendants knew when incarcerating the decedent that most jail suicides occur by hanging/strangulation, with inmates using objects available to them as ligatures.  Inmates

commonly use bed linens, mattresses, clothing (including drawstrings), telephone cords, television cords, straps, and trash bags.

### 2.    Fifth Circuit's Long-Held Constitutional Standard:    Continuous Observation and Monitoring

89.    Circuit Judge Goldberg, writing a concurring opinion on behalf of the United States Court of Appeals for the Fifth Circuit over 30 years ago, unambiguously wrote that the right to continual monitoring of prisoners with suicidal tendencies was clearly established.  In *Rhyne vs. Henderson County*, 973 F.2d 386 (5th Cir. 1992), the mother of a pre-trial detainee brought suit for the death of her child.  Judge Goldberg warned and put on notice all policymakers within the jurisdiction of the United States Court of Appeals for the Fifth Circuit regarding pre-trial detainees in need of mental health care (and specifically those with suicidal tendencies):

> Fortunately, the policymakers in charge can learn from their mistakes and take the necessary additional steps to insure the safety of pretrial detainees in need of mental health care. **Other municipalities should also take heed of the tragic consequences which are likely to ensue in the absence of adequate safety measures to deal with detainees displaying suicidal tendencies.**
>
> **What we learn from the experiences of Henderson County [Texas] is that when jailers know a detainee is prone to committing suicide, a policy of observing such a detainee on a periodic, rather than on a continuous, basis, will not suffice**; that vesting discretion in untrained jail personnel to assess the need for, and administer, mental health care, will not be responsive to the medical needs of mentally ill detainees; and that delegating the task of providing mental health care to an agency that is incapable of dispensing it on the weekends will endanger the well-being of its emotionally disturbed detainees. **We need not remind jailers and municipalities that the Constitution works day and night, weekends and holidays—it takes no coffee breaks, no winter recess, and no summer vacation**.
>
> So the plaintiff in this case did not prove that Henderson County adopted its policy of handling suicidal detainees with deliberate indifference to their medical needs. But that does not insulate Henderson County, or any other municipality, from liability in future cases. **Jailers and municipalities beware! Suicide is a real threat in the custodial environment. Showing some concern for those in custody, by taking limited steps to protect them, will not pass muster unless the strides taken to deal with the risk are calculated to work: Employing only**

> **"meager measures that [jailers and municipalities] know or should know to be ineffectual" amounts to deliberate indifference. To sit idly by now and await another, or even the first, fatality, in the face of the Henderson County tragedy, would surely amount to *deliberate* indifference.**

*Id.* at 395-96 (emphasis added).

Defendants were put on notice long ago that anything short of continuous monitoring of suicidal inmates was insufficient and violated the United States Constitution. The law was clearly established with exacting specificity, and Defendants were charged with knowledge of it.

     E.     Liability of the County

          1.     Introduction

90.     Plaintiff sets forth in this section of the pleading additional facts and allegations supporting liability claims against the County pursuant to *Monell v. Department of Soc. Svcs.,* 436 U.S. 658 (1978). It is Plaintiff's intent that all facts asserted in this pleading relating to policies, practices, and/or customs of the County support such *Monell* liability claims, and not just facts and allegations set forth in this section. Such policies, practices, and/or customs alleged in this pleading, individually and/or working together, were moving forces behind and caused the constitutional violations, and damages and death, referenced herein. These policies, practices, and/or customs are pled individually and alternatively. The County knew, when the County incarcerated the decedent, that their personnel, policies, practices, and/or customs were such that it could not meet its constitutional obligations to provide appropriate mental health treatment to, and protect, the decedent. The County made decisions about policy and practice which it implemented through its commissioner's court, its sheriff, its jail administrator, and/or through such widespread practice and/or custom that such practice and/or custom became the policy of the County as it related to its jail. The Fifth Circuit Court of Appeals has made it clear, through

controlling authority, that Plaintiff need not allege at the pleading stage the identity of chief policymaker(s).

91.     There were several policies, practices, and/or customs of the County which were moving forces behind, caused, were producing causes of, and/or proximately caused the decedent's suffering and death, and other damages referenced in this pleading.  The County made deliberate decisions, acting in a deliberately indifferent and/or objectively unreasonable manner, when implementing and/or allowing such policies, practices, and/or customs to exist.  Further, when the County implemented and/or consciously allowed such policies, practices, and/or customs to exist, it knew with certainty that the result would be serious injury, suffering, physical illness, and/or death.

### 2.    Williamson County Policies, Practices, and Customs

92.     Plaintiff lists beneath this heading some County policies, practices, and/or customs which Plaintiff alleges, at times upon information and belief, either individually and/or working together, caused, proximately caused, were producing causes of, and/or were moving forces behind all damages referenced in this pleading, including the decedent's death.  Thus, the County is liable for all such damages.

93.     The Williamson County Sheriff's Office had in place, at the time of Josh's suicide, what it entitled a "Suicide Prevention Plan." The plan is comprised of three pages. The plan lists the policy of the Williamson County Sheriff's Office to preserve the life and safety of all people incarcerated in the jail, while protecting inmates and staff. The Suicide Prevention Plan also lists as its purpose to establish guidelines and procedures for the Williamson County Sheriff's Office to have in place a procedure to ensure inmates do not successfully commit suicide while in custody. However, the only "procedure" listed in the Suicide Prevention Plan reads as follows: "An

aggressive suicide prevention program is the first line of defense against inmate suicide attempts within our jail facilities. Inherent components of this prevention effort are to detect and report any inmate who seems to be depressed or who has threatened suicide, and the immediate removal of any item which may be used in a suicide attempt."

94.     The remainder of the three-page document addresses response procedures for a detainee who "has hung himself." Thus, the Suicide Prevention Plan was no prevention plan at all. It provided no plan as to how to prevent suicides, but instead only addressed what was to happen after a person, such as Josh, has already formed a ligature and hung himself.

95.     Pleading in the alternative, if County policy, practice, and/or custom were such that Individual Defendants and others interacting with the decedent were not provided with and/or had access to information regarding prior decedent incarcerations, then such was a producing and proximate cause of all damages set forth in this pleading.  It is vital that those working with jail detainees be provided a full picture of those detainees, including through access to records of prior incarcerations.  This was particularly important in this case, due to a mountain of evidence regarding Josh's suicidal tendencies.

96.     Upon information and belief, County policy, practice, and/or custom were such that, during booking, County representatives and/or employees would not verify the accuracy of self-provided information.  Thus, by way of example, during the May 7, 2002 booking referenced above, Josh's "no" responses to the same questions to which he responded "Yes" during an August 2001 booking appear not to have been verified.  This was vitally important, as Josh's "yes" responses during the August 2001 booking indicated that Josh had either thought about or attempted to kill himself previously.  This policy, practice, and/or custom interacted with, and in the alternative and to the extent necessary upon information and belief, with the policy, practice,

and/or custom of potentially not sharing with jail employees information regarding prior incarcerations.

97.    Upon information and belief, Williamson County's policy, practice, and/or custom was not such that a suicidal person, such as Josh, would be continuously monitored. All Defendants knew, and every reasonable jailer knows, that it only takes one to two minutes, at most, for a detainee to form a ligature using jail closing, bedding, or other types of fabrics. They also knew, upon information and belief, that a person can die as a result in a very few minutes. Thus, anything short of continuous monitoring, especially if a person is allowed to be in a cell with items with which he can make a ligature, and tie-off points, violates the Constitution.

98.    Pleading in the alternative, and upon information and belief, if the County did not have in place a policy, practice, and/or custom of clearly communicating the recommendation of a QMHP, regarding keeping a person on suicide watch, to appropriate jailers and other personnel working in the jail, then such was a moving force behind and proximate cause of all damages and death referenced in this pleading. Stated differently, if the policy was not to effectively communicate such information, then such policy was constitutionally deficient.

99.    Upon information and belief, the policy, practice, and/or custom of the County was to return to detainees, following a QMHP evaluation, items with which a person could form a ligature. Upon information and belief, this may have been true even if the QMHP decided to keep the person on suicide watch. Evidence of this is the conflicting stories of Jailer McBay and Medical Officer Pecorilla, taken in conjunction with Investigator Bearden indicating that Josh's items were returned to him after the QMHP evaluation "per jail standards." Plaintiff is entitled to plead in the alternative, and Plaintiff is also entitled to receive all reasonable inferences arising from such alternative pleading.

100.    The policy, practice, and/or custom of the County of allowing jail trustees to watch other inmates leads to situtations such as that in this case.  Trustees are people who have been arrested for offenses, and jailed.  They are not County employees, unless they were County employees before their arrests.  They are not trained jailers.  Allowing the jail to use trustees to fulfill constitutional duties to inmates is highly suspect and deliberately indifferent to inmate rights.

101.    Upon information and belief, the County did not reprimand, require additional training or education of, write-up, or terminate any person, including Individual Defendants, regarding action or inaction related to events leading to Josh's death.  This confirms that Individual Defendants and/or other County employees acted consistent with pre-existing policy, practice, and/or custom.

### 3.    TCJS Records Demonstrating County Practices and/or Customs

102.    TCJS reports and documents regarding inspections of the County jail further demonstrate these and other policies, practices, and/or customs which, when applied individually and/or working together, caused, were proximate causes of, and/or were producing causes of damages and death asserted in this pleading.  TCJS documents also show that the County was put on notice of deficient policies, practices, and customs well before the decedent's death.  Any documents regarding inspections after the decedent's death are some evidence of pre-existing policies, practices, and/or customs.

103.    The TCJS inspected the Williamson County jail from February 21 through 22, 2012. Among other issues, TCJS inspectors saw that face-to-face documentation on direct supervision pods exceeded 60 minutes at times. TCJS inspectors had to remind jailers that such face-to-face observations of inmates must be documented within a 60-minute period.

104.    The TCJS inspected the Williamson County jail again on February 28, 2013. As was true with all other inspections, upon information and belief, the Williamson County sheriff, Williamson County jail administrator, and a commissioners' court representative were notified of the inspections, and in fact signed evidencing such notification. During the February 28, 2013 inspection, TCJS inspectors found that Williamson County continued to have issues with detainee observations. When reviewing holding and detox cell face-to-face observations, TCJS inspectors learned that jailers exceeded the 30-minute observation period, which was established by minimum jail standards, on occasion. TCJS inspectors recommended that the jail change its 30-minute checks in those areas of the jail to 20-minute checks. Equally troubling, a TCJS inspector found that the jail was not notifying a judge as required by Texas law when an inmate was an exact match or confirmed possible match through the CCQ system. Thus, if an inmate had previously received inpatient mental healthcare, and such was identified through the CCQ system, the jail was not notifying anyone outside the jail. Magistrate notification is essential, so that a mental health evaluation can be ordered when appropriate.

105.    The TCJS inspected the Williamson County jail again from February 10 through 12, 2014. Jail practices and customs regarding inmate observations continued to be a problem. A TCJS inspector, when reviewing the jail's hourly face-to-face observation documentation, found that on occasion a jailer would not make checks within the 60-minute period. The TCJS inspector recommended that the jail change its internal policy to make checks in such areas no less often than every 45 minutes. As with the 30/20-minute checks referenced above, and the 60/45-minute checks referenced here, neither was adequate for a suicidal inmate. Neither would constitutionally protect such an inmate. Regardless, the jail's ongoing continuous issues with making checks even

in accordance with lax TCJS standards is some evidence of practice and custom regarding such laxness.

106.    The TCJS inspected the Williamson County jail again on October 12, 2015. As a result, Williamson County was provided written notice that deficiencies in its jail existed. TCJS urged Williamson County to give areas of non-compliance its serious and immediate consideration, and to promptly initiate and complete appropriate corrective measures. Written notice to Williamson County indicated that its failure to initiate and complete corrective measures following receipt of a notice of non-compliance from the TCJS could result in issuance of a remedial order. Not surprisingly, Williamson County being found to be non-compliant, and thus listed as being non-compliant with other similar jails in Texas by the TCJS, occurred as a result of Williamson County continuing to not complete visual face-to-face observations. The inspection report read in part, "Documentation received and reviewed by the commission revealed that Williamson County is not completing visual face-to-face observation of all inmates at least once every 60 minutes as required by minimum jail standards."

107.    The TCJS inspected the Williamson County jail again from May 22 through 24, 2017. Williamson County, continuing with its apparent improper custom and practice, continued to have issues properly observing and checking inmates. When a TCJS inspector reviewed face-to-face jail observation records for holding and detox cells, documentation showed, as it had for years, that jailers exceeded the 30-minute limit on occasion. The TCJS pointed out once again that the 30-minute interval, for certain portions of the jail, was a minimum TCJS standard. However, TCJS standards do not equal constitutional standards. TCJS standards, like standards adopted by any governmental agency, can be adopted with deliberate indifference. Moreover, TCJS standards

are affected by stakeholders, such as sheriffs, who complain to TCJS that too stringent standards make it difficult for them to operate their jails.

108.    The TCJS inspected the Williamson County jail again from February 20 through 21, 2018. Not surprisingly, Williamson County, upon information and belief pursuant to custom and practice, continued to have issues with making appropriate inmate observations. When reviewing the jail's holding and detox face-to-face observation documentation, a TCJS inspector found that on occasion a jailer would make checks exceeding the required 30-minute maximum interval. The inspector, as had happened previously, recommended that the jail change the interval in that portion of the jail from 30 minutes to 20 minutes. Clearly, Williamson County was not getting the message. Moreover, when the inspector reviewed the jail's hourly face-to-face observation documentation in areas in which inmates had to be observed no less than once every 60 minutes, the inspector found, once again, that jailers were exceeding that period on occasion. Once again, the inspector recommended that the jail change its internal policy to make checks in those areas every 45 minutes instead of every 60 minutes.

109.    The TCJS inspected the Williamson County jail again from December 10 through 12, 2019. The Williamson County jail was once again found to be non-compliant. It was thus listed at the TCJS website, with a short list of other jails who were also found to be non-compliant. The TCJS once again warned the Williamson County jail that, if it failed to initiate and complete corrective measures after receiving the notice of non-compliance, TCJS could issue a remedial order. A TCJS inspector determined, when reviewing inmate medical files, that two inmates had not received a specialist appointment as ordered by the jail physician. TCJS records indicate other issues found during that inspection.

110.    The TCJS inspected the Williamson County jail again on August 18, 2020. Once again, the Williamson County jail was found to be non-compliant with minimum jail standards. TCJS once again urged Williamson County to give areas of non-compliance its serious and immediate consideration and to promptly initiate and complete appropriate corrective measures. TCJS warned Williamson County again that its failure to initiating and complete corrective measures following receipt of a notice of non-compliance could result in issuance of a remedial order. A TCJS inspector, after interviewing staff and reviewing documentation, found that an inmate was not being provided recreation as required by minimum jail standards. Further, that inmate was not even provided access to sunlight as required by minimum jail standards. These requirements go to basic human decency, and the failure to fulfill them can lead to or exacerbate existing mental health issues. The particular inmate was not provided recreation from March 13, 2019 to November 13, 2019.

### 4.    Other Deaths at the County Jail

111.    The County was put on notice long ago that it must have in place appropriate policies, practices, and/or customs to prevent inmate suicides. It was put on notice of several issues, including the manner in which inmates typically commit suicide, the importance of continuous observation, and the need to assure that inmates with self-harm tendencies are not put into cells which have tie-off points and which contain items which could be used as ligatures.  The County was also put on notice of the need to observe inmates generally.

112.    On or about June 26, 2015, Ray Steven Rose was found deceased with a telephone cable wrapped around his neck during a routine cell check.  Mr. Rose had entered the Williamson County Jail less than two hours earlier after being arrested for driving while intoxicated and was

placed in a detox holding cell alone. Williamson County knew well before the decedent's death in this case that inmates would improvise ligatures to hang themselves.

113.    On or about August 8, 2015 Francisco Vasquez was found hanging by his own shirt from the metal privacy partition for the toilet.  Mr. Vasquez had entered the Williamson County Jail less than one hour earlier after being arrested for driving while intoxicated and was placed in a detox holding cell alone.  Mr. Vasquez was transferred to a local hospital, where he was pronounced dead.  Thus Williamson County was again put on notice of inmates using tie-off points and ligatures to commit suicide.

114.    On or about April 18, 2017, Williamson County inmate Daniel McCoy was found unresponsive in his cell after his serious medical needs were ignored by the jail.  Mr. McCoy was only 24 years old.  Mr. McCoy was booked into the jail at approximately 8:00 p.m. on October 9, 2017.  Mr. McCoy suffered from schizophrenia and had been found incompetent to stand trial. For six months, Mr. McCoy was incarcerated while awaiting transfer to a mental health facility for competency restoration.  While deprived of his liberty and adequate mental health treatment at the Williamson County jail, witnesses observed Mr. McCoy "eating his own excrement, drinking…his own bodily fluids, and eating scum and bacteria from the toilet located in his cell."  Regardless, jail staff did not seek any medical assistance until it was too late, even though Mr. McCoy was violently vomiting all over himself and his cell. Instead, jailers moved him to another cell. Mr. McCoy eventually stopped breathing and passed away at a local hospital

115.    On or about May 6, 2019, Patrick Paul Dupre committed suicide in the Williamson County Jail using his bedsheet. Just like Joshua McNatt, Mr. Dupre tied one end of the sheet from his bunk handle and the other end around his neck.  Mr. Dupre was found when a jailer conducting ordinary rounds passed by and noticed him hanging. Mr. Dupre was transferred to a local hospital,

where he subsequently died. Through the 2019 death of Mr. Dupre, Williamson County was specifically put on notice of inmates using the bunk handle and bedsheets to hang themselves.

III.     Causes of Action

   A.     14th Amendment Due Process Claims Under 42 U.S.C. § 1983: Objective Reasonableness Pursuant to *Kingsley v. Hendrickson*

116.     In *Kingsley v. Hendrickson,* 135 S. Ct. 2466 (2015), a pretrial detainee sued several jail officers alleging that they violated the 14th Amendment's Due Process Clause by using excessive force against him. *Id*. at 2470. The Court determined the following issue: "whether, to prove an excessive force claim, a pretrial detainee must show that the officers were *subjectively* aware that their use of force was unreasonable, or only that the officer's use of that force was *objectively* unreasonable." *Id.* (emphasis in original). The Court concluded that the objectively unreasonable standard was that to be used in excessive force cases, and that an officer's subjective awareness was irrelevant. *Id.* The Court did so, acknowledging and resolving disagreement among the Circuits. *Id.* at 2471-72.

117.     The Court flatly wrote "the defendant's state of mind is not a matter that a plaintiff is required to prove." *Id.* at 2472. Instead, "courts must use an objective standard." *Id* at 2472-73. "[A] pretrial detainee must show only that the force purposefully or knowingly used against him was objectively unreasonable." *Id.* at 2473. Thus, the Court required no *mens rea*, no conscious constitutional violation, and no subjective belief or understanding of offending police officers, or jailers, for an episodic claim but instead instructed all federal courts to analyze officers', or jailers', conduct on an objective reasonability standard. Since pretrial detainees' rights to receive reasonable medical and mental health care, to be protected from harm, and not to be punished at all, also arise under the 14th Amendment's Due Process Clause, there is no reason to apply a different standard when analyzing those rights.

118.    Thus, the trail leads to only one place – an objective unreasonableness standard, with no regard for officers' or jailers' subjective belief or understanding, should apply in this case and all pretrial detainee cases arising under the Due Process Clause of the 14th Amendment.  The Fifth Circuit, and the district court in this case, should reassess Fifth Circuit law in light of *Kingsley* and apply an objective unreasonableness standard to constitutional claims in this case.  The court should not apply a subjective state of mind and/or deliberate indifference standard.  The Supreme Court discarded the idea that a pretrial detainee should have such a burden.

B.    Remedies for Violation of Constitutional Rights

119.    The United States Court of Appeals for the Fifth Circuit has held that using a state's wrongful death and survival statutes creates an effective remedy for civil rights claims pursuant to 42 U.S.C. § 1983.  Therefore, Plaintiff individually, and on behalf of Wrongful Death Beneficiaries and Claimant Heirs, seeks, for causes of action asserted in this complaint, all remedies and damages available pursuant to Texas and federal law, including but not necessarily limited to the Texas wrongful death statute (Tex. Civ. Prac. & Rem. Code § 71.002 *et seq.*), the Texas survival statute (Tex. Civ. Prac. & Rem. Code § 71.021), the Texas Constitution, common law, and all related and/or supporting case law.  If the decedent would had lived, the decedent would have been entitled to bring a 42 U.S.C. § 1983 action for violation of the United States Constitution and obtain remedies and damages provided by Texas and federal law.  Plaintiff incorporates this remedies section into all sections in this complaint asserting cause(s) of action and requests for relief.

C.    Cause of Action Against Individual Defendants Under 42 U.S.C. § 1983 for Violation of Constitutional Rights

120.    In the alternative, without waiving any of the other causes of action pled herein, without waiving any procedural, contractual, statutory, or common-law right, and incorporating all other allegations herein (including all allegations in the "Factual Allegations" section above) to the extent they are not inconsistent with the cause of action pled here, Individual Defendants are liable to Plaintiff individually, Claimant Heirs, and Wrongful Death Beneficiaries, pursuant to 42 U.S.C. § 1983, for violating the decedent's rights to reasonable medical/mental health care, to be protected, and/or not to be punished as a pretrial detainee.  These rights are guaranteed by at least the 8th and/or 14th Amendments to the United States Constitution.  Pre-trial detainees are entitled to protection, and also not to be punished at all, since they have not been convicted of any alleged crime resulting in their incarceration.

121.    Individual Defendants acted and failed to act under color of state law at all times referenced in this pleading.  They wholly or substantially ignored the decedent's obvious serious mental health issues and self-harm tendencies, and they were deliberately indifferent to and acted in an objectively unreasonable manner regarding those issues and/or tendencies.  They failed to protect the decedent, and their actions and/or inaction referenced in this pleading resulted in unconstitutional punishment of the decedent.  Individual Defendants were aware of the excessive risk to the decedent's health and safety and were aware of facts from which an inference could be drawn of serious harm, suffering, and death.  Moreover, they in fact drew that inference.  Individual Defendants violated clearly–established constitutional rights, and their conduct was objectively unreasonable in light of clearly–established law at the time of the relevant incidents.

122.    Individual Defendants are also liable pursuant to the theory of bystander liability. Bystander liability applies when the bystander jailer/officer/nurse (1) knows that a fellow jailer/officer/nurse is violating a person's constitutional rights; (2) has a reasonable opportunity to

prevent the harm; and (3) chooses not to act.  As demonstrated through facts asserted in this pleading, Individual Defendants' actions and inaction meet all three elements.  They are therefore also liable to Plaintiff individually, Claimant Heirs, and Wrongful Death Beneficiaries pursuant to this theory.

123.    In the alternative, Individual Defendants' deliberate indifference, conscious disregard, state of mind, subjective belief, subjective awareness, and/or mental culpability are irrelevant to determination of constitutional violations set forth in this section of this pleading. The United States Supreme Court, in *Kingsley v. Hendrickson,* 135 S. Ct. 2466 (2015), determined the state of mind necessary, if any, for officers/jailers sued in a case alleging excessive force against a pretrial detainee in violation of the 14th Amendment's Due Process Clause.  *Id* at 2470- 71.  Constitutional rights set forth in this section of the pleading, and constitutional rights affording pretrial detainees protection against excessive force, all flow from the 14th Amendment's Due Process Clause.  *Id.*  Since such constitutional protections flow from the same clause, the analysis of what is necessary to prove such constitutional violations is identical.

124.    Individual Defendants are not entitled to qualified immunity.[1]  Their failure to protect the decedent, and other actions and/or inaction referenced in this pleading, caused,

---

[1]    The defense of qualified immunity is, and should be held to be, a legally impermissible defense. In the alternative, it should be held to be a legally impermissible defense except as applied to state actors protected by immunity in 1871 when 42 U.S.C. § 1983 was enacted.  Congress makes laws. Courts do not.  However, the qualified immunity defense was invented by judges.  When judges make law, they violate the Separation of Powers doctrine, and the Privileges and Immunities Clause of the United States Constitution.  Plaintiff respectfully makes a good faith argument for the modification of existing law, such that the court–created doctrine of qualified immunity be abrogated or limited.

Individual Defendants cannot show that they are entitled to qualified immunity.  This should be Individual Defendants' burden, if they choose to assert the alleged defense.  Qualified immunity, as applied to persons not immunized under common or statutory law in 1871, is

proximately caused, and/or were producing causes of the decedent's suffering and death and other damages mentioned and/or referenced in this pleading, including but not limited to those suffered by Plaintiff individually, Claimant Heirs, and Wrongful Death Beneficiaries.

125.    Therefore, the decedent's estate and/or his heirs at law (Claimant Heirs) suffered the following damages, for which they seek recovery, through the administrator, from Individual Defendants:

- the decedent's conscious physical pain, suffering, and mental anguish;

- the decedent's loss of life and/or loss of enjoyment of life;

- the decedent's medical expenses;

- the decedent's funeral expenses; and

- exemplary/punitive damages.

---

untethered to any cognizable legal mandate and is flatly in derogation of the plain meaning and language of Section 1983. *See Ziglar v. Abassi*, 137 S. Ct. 1843, 1870-72 (2017) (Thomas, J., concurring). Qualified immunity should have never been instituted as a defense, without any statutory, constitutional, or long-held common law foundation, and it is unworkable, unreasonable, and places too high a burden on Plaintiffs who suffer violation of their constitutional rights. Joanna C. Schwartz, *The Case Against Qualified Immunity,* 93 Notre Dame L. Rev. 1797 (2018) (observing that qualified immunity has no basis in the common law, does not achieve intended policy goals, can render the Constitution "hollow," and cannot be justified as protection for governmental budgets); and William Baude, *Is Qualified Immunity Unlawful?*, 106 Calif. L. Rev. 45, 82 (2018) (noting that, as of the time of the article, the United States Supreme Court decided 30 qualified immunity cases since 1982 and found that defendants violated clearly established law in only 2 such cases). Justices including Justice Thomas, Justice Breyer, Justice Kennedy, and Justice Sotomayor have criticized qualified immunity. *Schwartz, supra* at 1798–99. *See also Cole v. Carson*, _ F.3d _, 2019 WL 3928715, at * 19-21, & nn. 1, 10 (5th Cir. Aug. 21, 2019) (en banc) (Willett, J., Dissenting). Additionally, qualified immunity violates the separation of powers doctrine of the Constitution. *See generally* Katherine Mims Crocker, *Qualified Immunity and Constitutional Structure*, 117 Mich. L. Rev. 1405 (2019) (available at https://repository.law.umich.edu/mlr/vol117/iss7/3). Plaintiffs include allegations in this footnote to assure that, if legally necessary, the qualified immunity abrogation or limitation issue has been preserved.

126.    Plaintiffs and Wrongful Death Beneficiaries also individually seek and are entitled to all remedies and damages available to each such person individually for 42 U.S.C. § 1983 claims.  They seek such damages as a result of the wrongful death of their son or father, as applicable.  Those damages were caused and/or proximately caused by Individual Defendants.  Therefore, their actions caused, were a proximate cause of, and/or were a producing cause of the following damages suffered by these people, for which they individually seek compensation, each as legally appropriate:

- pecuniary loss – the loss of care, maintenance, support, services, advice, counsel, and reasonable contributions of a pecuniary value (excluding loss of inheritance);

- loss of inheritance (for children of decedent);

- expenses for the decedent's funeral;

- past mental anguish and emotional distress suffered as a result of the decedent's death;

- future mental anguish and emotional distress suffered as a result of the decedent's death;

- loss of consortium, companionship, and/or society (each category as appropriate for the specific category of wrongful death beneficiary) that they would have received from the decedent; and

- exemplary/punitive damages.

Exemplary/punitive damages are appropriate in this case to deter and punish clear and unabashed violation of the decedent's constitutional rights.  Individual Defendants' actions and inaction showed a reckless or callous disregard of, or indifference to, the decedent's rights and safety.  Moreover, Plaintiff individually, Claimant Heirs, and Wrongful Death Beneficiaries seek reasonable and necessary attorneys' fees available pursuant to 42 U.S.C. §§ 1983 and 1988.

D.    Cause of Action Against the County Under 42 U.S.C. § 1983 for Violation of Constitutional Rights

127.    In the alternative, without waiving any of the other causes of action pled herein, without waiving any procedural, contractual, statutory, or common-law right, and incorporating all other allegations herein (including all allegations in the "Factual Allegations" section above) to the extent they are not inconsistent with the cause of action pled here, the County is liable to Plaintiff individually, Claimant Heirs, and Wrongful Death Beneficiaries, pursuant to 42 U.S.C. § 1983, for violating the decedent's rights to reasonable medical/mental health care, to be protected, and/or not to be punished as a pre-trial detainee.  These rights are guaranteed by at least the 8th and/or 14th Amendments to the United States Constitution.  Pretrial detainees are entitled to be protected and not to be punished at all, since they have not been convicted of any alleged crime resulting in their incarceration.

128.    The County acted or failed to act through natural persons including Individual Defendants, under color of state law at all relevant times.  The County's policies, practices, and/or customs were moving forces behind and caused, were producing causes of, and/or were proximate causes of the decedent's suffering, damages, and death, and all damages suffered by Plaintiff individually, Claimant Heirs, and Wrongful Death Beneficiaries.

129.    Controlling Fifth Circuit Court of Appeals precedent is clear:  Plaintiff need not allege the appropriate chief policymaker(s) at the pleadings stage.  Nevertheless, out of an abundance of caution, the sheriff of the County was the County's relevant chief policymaker over matters at issue in this case.  Moreover, in addition, and in the alternative, the County jail administrator was the relevant chief policymaker over matters at issue in this case.  Finally, in addition, and in the alternative, the County's commissioners' court was the relevant chief policymaker.

130.    The County was deliberately indifferent regarding policies, practices, and/or customs developed and/or used with regard to issues addressed by allegations set forth above.  It also acted in an objectively unreasonable manner.  Policies, practices, and/or customs referenced above, as well as the failure to adopt appropriate policies, were moving forces behind and caused violation of the decedent's rights and showed deliberate indifference to the known or obvious consequences that constitutional violations would occur.   The County's relevant policies, practices, and/or customs, whether written or not, were also objectively unreasonable as applied to the decedent.

131.    Therefore, the decedent's estate and/or his heirs at law (Claimant Heirs) suffered the following damages, for which they seek recovery, through the administrator, from the County:

- the decedent's conscious physical pain, suffering, and mental anguish;

- the decedent's loss of life and/or loss of enjoyment of life;

- the decedent's medical expenses; and/or

- the decedent's funeral expenses.

132.    Plaintiff and Wrongful Death Beneficiaries also individually seek and are entitled to all remedies and damages available to each such person individually for the 42 U.S.C. § 1983 violations.  They seek such damages as a result of the wrongful death of their son or father, as applicable.   The County's policies, practices, and/or customs caused, were proximate and/or producing causes of, and/or were moving forces behind and caused the following damages suffered by these people, for which they individually seek compensation:

- pecuniary loss – the loss of care, maintenance, support, services, advice, counsel, and reasonable contributions of a pecuniary value (excluding loss of inheritance);

- loss of inheritance (for children of decedent);

- expenses for the decedent's funeral;

- past mental anguish and emotional distress suffered as a result of the decedent's death;

- future mental anguish and emotional distress suffered as a result of the decedent's death; and

- loss of consortium, companionship, and/or society (each category as appropriate for the specific category of wrongful death beneficiary) that they would have received from the decedent.

Moreover, Plaintiff individually, Claimant Heirs, and Wrongful Death Beneficiaries seek reasonable and necessary attorneys' fees available pursuant to 42 U.S.C. §§ 1983 and 1988.

IV.     Concluding Allegations and Prayer

        A.     Conditions Precedent

133.    All conditions precedent to assertion of all claims herein have occurred.

        B.     Use of Documents at Trial or Pretrial Proceedings

134.    Plaintiff individually, Claimant Heirs, and Wrongful Death Beneficiaries intend to use at one or more pretrial proceedings and/or at trial all documents produced by Defendants in this case in response to written discovery requests, with initial disclosures (and any supplements or amendments to same), and in response to Public Information Act request(s).

        C.     Jury Demand

135.    Plaintiff individually, Claimant Heirs, and Wrongful Death Beneficiaries demand a jury trial on all issues which may be tried to a jury.

        D.     Prayer

136.    For these reasons, Plaintiff individually, Claimant Heirs, and Wrongful Death Beneficiaries ask that Defendants be cited to appear and answer, and that Plaintiff individually,

Claimant Heirs, and Wrongful Death Beneficiaries have judgment for damages within the jurisdictional limits of the court and against all Defendants, jointly and severally, as legally available and applicable, for all damages referenced above and below in this pleading:

      a)      actual damages of and for Plaintiff individually, Claimant Heirs, and Wrongful Death Beneficiaries, including but not necessarily limited to:

- pecuniary loss – the loss of care, maintenance, support, services, advice, counsel, and reasonable contributions of a pecuniary value (excluding loss of inheritance);

- loss of inheritance (for children of decedent);

- expenses for the decedent's funeral;

- past mental anguish and emotional distress suffered as a result of the decedent's death;

- future mental anguish and emotional distress suffered as a result of the decedent's death; and

- loss of consortium, companionship, and/or society (each category as appropriate for the specific category of wrongful death beneficiary) that they would have received from the decedent;

      b)      exemplary/punitive damages for Plaintiff individually, Claimant Heirs, and Wrongful Death Beneficiaries, from Individual Defendants;

      c)      reasonable and necessary attorneys' fees for Plaintiff individually, Claimant Heirs, and Wrongful Death Beneficiaries, through trial and any appeals and other appellate proceedings, pursuant to 42 U.S.C. §§ 1983 and 1988;

      d)      court costs and all other recoverable costs;

e)    prejudgment and postjudgment interest at the highest allowable rates; and

f)    all other relief, legal and equitable, general and special, to which Plaintiff individually, Claimant Heirs, and Wrongful Death Beneficiaries are entitled.

Respectfully submitted:


_____/s/ T. Dean Malone_____
T. Dean Malone

T. Dean Malone
Attorney-in-charge
dean@deanmalone.com
Texas State Bar No. 24003265
Law Offices of Dean Malone, P.C.
900 Jackson Street, Suite 730
Dallas, Texas 75202
Telephone:   (214) 670-9989
Telefax:       (214) 670-9904

Of Counsel:

Michael T. O'Connor
Texas State Bar No. 24032922
michael.oconnor@deanmalone.com
Kristen Leigh Homyk
Texas State Bar No. 24032433
kristen.homyk@deanmalone.com
Jennifer Kingaard
Texas State Bar No. 24048593
jennifer.kingaard@deanmalone.com
Jordan A. Shannon
Louisiana State Bar No. 37868
jordan.shannon@deanmalone.com
Alexandra W. Payne
Texas State Bar No. 24118939
alexandra.payne@deanmalone.com
Law Offices of Dean Malone, P.C.
900 Jackson Street, Suite 730
Dallas, Texas 75202
Telephone:     (214) 670-9989
Telefax:         (214) 670-9904

Timothy Raub
Texas State Bar No. 00789570
tim@raub.law
Raub Law Firm, P.C.
814 Leopard Street
Corpus Christi, Texas 78401
Telephone:     (361) 880-8181

Attorneys for Plaintiffs